IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

|  |  |  |
|---|---|---|
| DANIEL MORGAN GRADUATE SCHOOL OF NATIONAL SECURITY, | ) ) ) ) | |
| Plaintiff, | ) ) ) ) | |
| v. | ) ) | Civil Action No. 1:17-cv-00576 |
| LINDA MILLIS, | ) ) ) | |
| Defendant. | ) | |

### Memorandum Opinion

THIS MATTER comes before the Court on Defendant's Motion for Summary Judgment on Plaintiff's claims and Plaintiff's Motion for Summary Judgment on Defendant's counterclaims. Plaintiff Daniel Morgan Graduate School of National Security ("DMGS") is a private, non-profit educational institution in Washington, DC, that offers post-graduate programs for individuals interested in the national security and intelligence fields. One of the co-founders of DMGS was Mark Levin, who officially served as an unpaid advisor to the school's president. Defendant Linda Millis began working for DMGS on or about May 31, 2016, and was designated as the Executive Director of DMGS in July 2016. She reported directly to Ambassador Joseph DeTrani, the former President of DMGS.

On August 29, 2016, Millis reported information to DMGS Board Chair Abby Moffat revealing that Levin had engaged in inappropriate sexual conduct with students at his private residence. DMGS suspended Levin from his role as Special Advisor and engaged attorney-investigator Elizabeth Gramigna to conduct an independent investigation. After completing her investigation, Gramigna submitted to DMGS her final attorney-client privileged investigative report, which consisted of two separate reports: the Executive Summary Report containing all of her findings and recommendations but with individual student names omitted to maintain privacy, and the Confidential Appendix containing individual student names and personal identifying information. The Executive Summary was provided to the Board, but the Confidential Appendix was not. Based on the report, DMGS permanently severed its relationship with Levin in October 2016.

On November 1, 2016, the Board met with its counsel to conduct an attorney-client privileged meeting to consider the report and recommendations of Gramigna, and Millis attended. At the meeting, the Board decided it would not disclose the confidential information in Gramigna's report, and would neither encourage nor discourage any person that thought that he was harmed by Levin from pursuing independent action against Levin. Millis later expressed disagreement with these decisions.

John Doe, a former employee of DMGS and one of the

witnesses interviewed by Gramigna, contacted the Arlington County Police on November 3, 2016, regarding sexual abuse committed by Levin. Detective Brooks of the Arlington County Police Department met with John Doe on November 11, and Millis attended that meeting as well to provide Doe with emotional support. Millis asserts that she did not give Detective Brooks any documents or substantive information during that meeting. According to Millis, Doe provided Detective Brooks with a copy of the Executive Summary Report at Detective Brooks' request. On November 29, 2016, Detective Brooks met with then-President of DMGS Joseph DeTrani and Vice President Alan Kelly, and according to Detective Brooks' testimony, Kelly provided Detective Brooks another copy of the Executive Summary Report at that time.

In or around March 2017, employees of DMGS advised DMGS of their intent to file a lawsuit against DMGS regarding Levin's conduct. Millis disagreed with DMGS's response to the threatened litigation, leading her to tender her resignation from her position as Executive Director of DMGS. In her resignation letter, Millis stated that

> [t]he DMGS Board has refused to accept responsibility for the mental and sexual abuse of more than twenty students and employees of the school by the former Senior Advisor to the President. Instead of aggressively going after the perpetrator of these actions, the Board has decided to vilify and blame the victims. In my view, there has been an effort by some other senior leadership to cover up the severity of these actions. I can no longer serve this organization

> in good faith. However, I am willing to work with the staff and faculty for a smooth transition.

On April 4, 2017, a lawsuit was filed against DMGS and others in D.C. Superior Court by DMGS students and staff members John Doe, Richard Roe, and Paul Poe. DMGS alleges that Millis provided a copy of her resignation letter accusing DMGS of a cover-up to John Doe. The letter was publicly filed as an exhibit in the DC Court action against DMGS.

On April 5, 2017, the *Washington Post* published an article about the DC lawsuit, reporting that Millis had resigned in protest of DMGS's handling of the Levin matter. Another article about Levin was published by the *Washington Post* on May 4, 2017, which included an excerpt from Gramigna's Executive Summary Report, and a third article was published by the *Washington Post* on May 19, 2017, about DMGS's countersuit against the plaintiffs in the DC lawsuit. Millis asserts that she never provided her resignation letter to anyone for publication, nor did she provide the Executive Summary Report to the *Washington Post*.

DMGS filed suit against Millis on May 19, 2017. After this Court dismissed the initial Complaint, DMGS filed an Amended Complaint on August 2, 2017, asserting claims of breach of contract, breach of fiduciary duty of loyalty, and defamation *per se*. Millis filed her Answer on September 11, 2017, asserting four counterclaims: constructive discharge, unlawful

4

retaliation, abuse of process, and intentional infliction of emotional distress. DMGS filed a Motion for Summary Judgment on Millis's counterclaims on February 14, 2018, and Millis filed a Motion for Summary Judgment on DMGS's claims on February 27, 2018. Both motions were argued on March 9, 2018.

Under Federal Rule of Civil Procedure 56, a court should grant summary judgment if the pleadings and evidence show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In reviewing a motion for summary judgment, the court views the facts in the light most favorable to the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made, the opposing party has the burden to show that a genuine dispute of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The Court finds there is no genuine dispute of material fact and this case is ripe for summary judgment.

Millis is entitled to summary judgment on all of DMGS's claims. First, DMGS's defamation *per se* claim fails as a matter of law because DMGS has failed to present evidence to establish that Millis published a false and defamatory statement to a third party. In order to prove a claim of defamation under D.C.

law, the plaintiff must show that the defendant published a false and defamatory statement without privilege to a third party. Farah v. Esquire Magazine, 736 F.3d 528, 533-34 (D.C. Cir. 2013). According to the record, however, Millis only provided her resignation letter to employees and agents of Plaintiff DMGS. There is no evidence that Millis provided her resignation letter to the *Washington Post*. Millis has denied doing so in an affidavit, and DMGS has produced no evidence that Millis did so. None of the three *Washington Post* articles discuss Millis's resignation letter, quote from it, or attribute to Millis any statement describing a "cover up."

DMGS alleges that publication occurred when Millis provided her resignation letter to subordinates who filed suit against DGMS "so that the letter could in turn be published by her subordinates and also transmitted to the *Washington Post*." The only employee subordinate of Millis who received her resignation letter and filed suit against DMGS was John Doe, who testified at his deposition that he shared the resignation letter with no one beside his attorneys. DMGS has produced no evidence contradicting this. Millis's resignation letter was ultimately filed as an exhibit to a pleading in the D.C. lawsuit against DMGS. However, under D.C. law, statements made in the course of a judicial proceeding are protected by absolute privilege. Teltschik v. Williams & Jensen, PLLC, 748 F.3d 1285, 1287 (D.C.

6

Cir. 2014). Thus, DMGS has failed to prove the publication prong of its defamation claim.

The Complaint further alleges that Millis breached her fiduciary duty to DMGS by improperly disclosing confidential student information and attorney-client privileged information to the *Washington Post* and litigants adverse to DMGS, by subverting the DMGS Board's decision not to pursue Levin's prosecution with law enforcement, and by encouraging subordinates to sue DMGS while Millis was still employed by DMGS. This claim also fails as a matter of law.

First, DMGS has produced no evidence that Millis provided confidential student information or the attorney-client privileged Executive Summary Report to the *Washington Post*. Furthermore, with respect to the Executive Summary Report, DMGS waived its attorney-client privilege when Vice President Kelly provided the report to Detective Brooks at the November 29, 2016 meeting, before the *Washington Post* articles were published.

Second, DMGS's allegation that Millis "subverted" the DMGS Board decision not to pursue prosecution of Levin is based on the assertion that Millis encouraged John Doe to make a criminal complaint against Levin. However, DMGS has provided no witnesses or corroborating evidence to support this assertion. Doe testified under oath that he made the decision to report Levin's conduct to law enforcement without Millis's involvement, and

7

that Millis attended Doe's first meeting with Detective Brooks because Doe asked her to come for moral support.

Third, DMGS's allegation that Millis breached her fiduciary duty to DMGS by encouraging her subordinates to sue DMGS is likewise unsupported. DMGS identified three witnesses to support this claim--John Doe, Richard Roe, and Frank Fletcher--but none of these three witnesses testified in their depositions that they had any actual knowledge to support this claim.

Finally, even if DMGS had produced evidence to support these allegations, its claim for breach of fiduciary duty fails as a matter of law because DMGS cannot show that Millis's alleged breach has caused compensable harm. The evidence reveals that DMGS has never generated income and instead relies on financial grants. During deposition, however, DMGS's Rule 30(b)(6) witness, Alan Kelly, was unable to identify any loss of financial grants resulting from Millis's conduct and DMGS has indicated that no documents exist illustrating financial loss resulting from Millis's actions. DMGS has been unable to identify students who were allegedly disaffected by Millis's conduct. DMGS has alleged that it suffered harm through the loss of valuable affiliations as a result of Millis's conduct, but only identified a single lost affiliation, the Aspen Institute. DMGS has produced no evidence to support the assertion that the loss of affiliation with Aspen Institute was directly caused by

8

Millis's actions as opposed to the other events arising from the Levin matter generally. Finally, DMGS has produced no evidence of actual harm resulting from this lost affiliation. In short, DMGS has failed to produce evidence to demonstrate that Millis's alleged actions in breach of her fiduciary duty were the cause of any actual harm to DMGS.

The Complaint next asserts breach of contract against Millis, alleging that her actions breached provisions of the school's Second Revised Bylaws. However, this claim also fails because Millis was not contractually bound by the Bylaws. Throughout her period of employment, Millis's contractual relationship with DMGS was encapsulated in two successive fully integrated employment agreements. Neither of these agreements bound her to the Bylaws. Thus, the only contractual duties Millis owed DMGS during the relevant time frame are contained in the four corners of her employment contracts.

Moreover, even if she had been bound by the Bylaws, the conduct by which DMGS alleges Millis breached the Bylaws--disclosure of the Executive Summary Report to the *Washington Post*, encouraging students to file lawsuits against DMGS, and defaming DMGS--is unsupported by the evidence, as discussed *supra*. DMGS has produced no evidence to demonstrate that Millis provided the Executive Summary Report to the *Washington Post* or that she encouraged any students to file lawsuits. As for the

defamation claim, as discussed *supra*, DMGS has not produced evidence to establish publication of the resignation letter. Thus, the Court holds that DMGS's breach of contract claim also fails as a matter of law.

Millis has asserted four counterclaims against DMGS: constructive discharge, unlawful retaliation, abuse of process, and intentional infliction of emotional distress. Each of Millis's claims fails as a matter of law.

First, Millis's constructive discharge claim fails because Millis voluntarily resigned her employment with DMGS. Millis brings this claim under the DC Human Rights Act ("DCHRA"). When analyzing claims brought under the DCHRA, the same analysis and precedent used for Title VII claims applies. See Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1114 (D.C. Cir. 2000). Because Millis has not produced direct evidence of unlawful discrimination, the appropriate analysis is the McDonnell Douglas burden shifting framework. Id. Under this framework, the plaintiff bears the initial burden of establishing a *prima facie* case.

Since Millis resigned, the presumption is that her resignation was voluntary. Aliotta v. Bair, 614 F.3d 556, 566-67 (D.C. Cir. 2010). To overcome this presumption and prove constructive discharge, Millis must demonstrate that "a reasonable person in the employee's position would have felt

compelled to resign under the circumstances." Id. at 566. "Constructive discharge . . . requires a finding of discrimination and the existence of certain 'aggravating factors.'" Mungin v. Katten Muchin & Zavis, 116 F.3d 1549, 1558 (D.C. Cir. 1997).

Millis's own testimony and admissions make clear, however, that she resigned in protest of the treatment of others, not due to her own alleged mistreatment. Millis testified during her deposition that she disagreed with DMGS's legal strategy, and that this disagreement triggered her resignation. Furthermore, in her resignation letter, she stated her reason for resigning was because DMGS had "refused to accept responsibility" for the Levin matter, had chosen to "vilify and blame students," and because there had been "an effort by some other senior leadership to cover up the severity of [Levin's] action[s]."

Millis also fails to establish a *prima facie* case for retaliation. To establish a *prima facie* case for retaliation under the DCHRA, Millis must demonstrate that (1) she engaged in protected activity; (2) she suffered a materially adverse action; and (3) there is a causal connection between the two. Howard Univ. v. Green, 652 A.2d 41, 45 (D.C. 1994). To show material adversity, the plaintiff must show that the adverse action "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Burlington N. & Santa

11

Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006). A showing of "material adversity" is necessary to "separate significant from trivial harms." Id.

Millis has not demonstrated that she was subjected to a materially adverse employment action. The employment actions which Millis alleges were materially adverse are that Vice President Kelly became angry and raised his voice at her after she accompanied John Doe in his visit with Detective Brooks; that Kelly changed the organizational chart and removed subordinates from her supervision; and that Millis received a pay raise that was less than what had allegedly been promised to her previously. These grievances simply do not rise to the level of materially adverse employment actions.

Millis's abuse of process claim also fails as a matter of law, because she has not demonstrated that the initiation of this lawsuit was an improper use of process. To establish an abuse of process claim, a plaintiff must prove "(1) the existence of an ulterior purpose; and (2) an act in the use of the process not proper in the regular prosecution of the proceedings." Donohoe Const. Co., Inc. v. Mount Vernon Associates, 235 Va. 531, 539, 369 S.E.2d 857, 862 (1988).

Millis's abuse of process claim against DMGS is limited to the initiation of the instant litigation. She asserts that this constitutes abuse of process because DMGS's purpose in filing

the suit was to retaliate against her and discourage her from acting as a witness in other ongoing suits against DMGS. However, the Fourth Circuit has held that "[t]he regular use of process cannot constitute abuse, even though the user was actuated by a wrongful motive, purpose, or intent, or by malice." Ross v. Peck Iron & Metal Co., 264 F.2d 262, 268 (4th Cir. 1959). As Millis alleges nothing improper about the filing of this suit beyond her allegations of a wrongful motive, the abuse of process claim cannot stand.

Finally, Millis's claim for intentional infliction of emotional distress also fails, because she has not demonstrated that she suffered severe emotional distress or that DMGS engaged in outrageous conduct. Millis argues in her opposition to DMGS's Motion for Summary Judgment that D.C. law applies to this claim, and that D.C.'s standard for severity of emotional harm is less than that required under Virginia law. However, even under D.C. law, a plaintiff must show "(1) extreme and outrageous conduct on the part of the defendants, which (2) intentionally or recklessly (3) causes the plaintiff's severe emotional distress." Williams v. Dist. Of Columbia, 9 A.3d 484, 493-94 (D.C. 2010) (quoting Futrell v. Dep't of Labor Fed. Credit Union, 816 A.2d 793, 808 (D.C. 2003)). This standard requires conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be

13

regarded as atrocious, and utterly intolerable in a civilized community." Larijani v. Georgetown University, 791 A.2d 41, 44 (D.C. 1984).

The conduct that Millis alleges meets this standard is the same set of grievances she asserts as adverse employment actions under her previous claims, as well as the fact that she was "expected to go along with blaming and countersuing Levin's victims . . . ; given no other choice but to resign; and forced to defend" against this lawsuit. These allegations simply do not "go beyond all possible bounds of decency" or represent conduct that is "utterly intolerable in a civilized community."

Furthermore, Millis's counterclaim fails to establish that she suffered severe emotional distress as a result of DMGS's conduct. Under D.C. law, a plaintiff is required to demonstrate that she suffered severe emotional distress, and Millis has not offered evidence of such. In fact, Millis admitted in her deposition that she did not seek psychological or mental health counseling as a result of the alleged emotional distress caused by DMGS, and she further stated that she considered herself to be in good mental health from 2000 until the present. Thus, because Millis has not demonstrated either that DMGS engaged in outrageous conduct or that she suffered severe emotional distress, her claim for intentional infliction of emotional distress fails as a matter of law.

14

For the foregoing reasons, this Court finds that both parties are entitled to summary judgment. An appropriate order shall issue.

/s/ Claude M. Hilton
CLAUDE M. HILTON
UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
April 23, 2018